NUMBER 13-06-112-CV



COURT OF APPEALS
 


THIRTEENTH DISTRICT OF TEXAS



CORPUS CHRISTI - EDINBURG 


 


MICHAEL GIBNEY, INDIVIDUALLY

AND ON BEHALF OF MICRO-BLEND, INC., 

 Appellant,


v.


ROY CULVER, JR., 

CULVER INTERESTS, AND ANA-TECH, INC., 
Appellees.

 
 

On appeal from the 36th District Court of San Patricio County, Texas.

 

 

MEMORANDUM OPINION



Before Chief Justice Valdez and Justices Rodriguez and Garza


Memorandum Opinion by Justice Garza
 

 This is a two-part suit in which appellant, Michael Gibney, individually and on behalf
of Micro-Blend, Inc. ("Gibney"), brought (1) a shareholder derivative suit for fraud and
breach of fiduciary duty against appellees, Roy Culver, Jr., Micro-Blend, Inc., Culver
Interests, and Ana-Tech, Inc and (2) an individualized claim for shareholder oppression
against Roy himself. Gibney secured a judgment of $250,000 from the trial court, for
shareholder oppression, against Roy, but the trial court, through a directed verdict,
dismissed Gibney's derivative claims. By four issues, Gibney contends that (1) the trial
court erred in concluding that his derivative claims against Culver Interests were barred by
the applicable statute of limitations, (2) the trial court erred in concluding that his derivative
claims against Ana-Tech, Inc. were barred by the applicable statute of limitations, (1) (3) the
trial court's directed verdict on his derivative claims was premature and improper in that it
was not supported by the evidence in the record, and (4) the trial court erred in failing to
award prejudgment interest to Gibney. By three issues, taken out of order, on cross-appeal, Roy asserts that (1) the evidence in the record is legally insufficient to support the
jury's findings of excessive compensation, (2) no "shareholder oppression" occurred as a
matter of law, and (3) the trial court's judgment awarding individual damages to Gibney was
erroneous as a matter of law. We affirm in part and reverse and render in part. 

I. Factual Background

a. Micro-Blend, Inc. and Culver Interests

 Micro-Blend, Inc. ("Micro-Blend") is a close corporation originally formed in 1989. (2) 
Micro-Blend manufactured patented blending systems for soft drinks. The idea for Micro-Blend originated with Gibney and was financed by Roy. There were originally four
shareholders of Micro-Blend at its inception--Roy, his brother Doug Culver, Gibney, and
Michael Lucas--and later grew to a maximum of thirty-four shareholders. 

 Micro-Blend's corporate governance structure provided for a five-person board of
directors (the "Board") to be elected at their annual shareholders' meetings. Roy served
on the Board from the formation of Micro-Blend in 1989 until 1991. Doug served on the
Board from 1989 until 1993. Roy, however, served as the chief executive officer of Micro-Blend since its inception. Gibney, the third largest shareholder in Micro-Blend, was a
member of the Board from 1989 until 1994. (3) Gibney asserts that he resigned from the
Board with the title of Vice-President of Micro-Blend. (4)

 In 1991 and 1992, Micro-Blend's systems were assembled on "skids" in Ingleside,
Texas, which were then delivered to the customer and installed, rather than assembled on
site at the customer's plant. Micro-Blend began contracting with Kemp Industries to build
the systems on skids. (5) However, Kemp Industries had problems with quality-control and
timeliness, so an alternate plan was needed.

 At a meeting on August 29, 1994, the Board passed Gibney's motion to have Roy
actively pursue other companies to manufacture the skids. At a Board meeting on January
13, 1995, the Board authorized a contract with Culver Interests to manufacture the skids. (6) 
Culver Interests continued to manufacture the systems until Culver Interests Number 3
dissolved in 1997. (7) At that time, Culver Interests gave its assets--the equipment and
materials used in the production of the skids--to Micro-Blend and Micro-Blend commenced
production of the skids on its own. (8) 

b. Ana-Tech, Inc.

 Ana-Tech, Inc. ("Ana-Tech") was formed by Roy in the 1980s to supply trained
technicians skilled in calibrating and repairing gauges and metering devices for refineries
and chemical plants on a temporary basis. Roy and Doug each owned 50% of the stock
of Ana-Tech even though Roy ran the company himself. Valero Refinery, Dupont, Oxy,
and CPPC were among Ana-Tech's past customers. Essentially, Ana-Tech was an
"instrumentation labor pool contractor." In addition, Ana-Tech provided workers
compensation insurance on its employees, including the technicians it supplied to
customers and its clerical and administrative staff. 

c. The Relationship Between Ana-Tech and Micro-Blend

 From the inception of Micro-Blend, Ana-Tech supplied all employees to the
company. In fact, Roy contends that "Gibney himself was paid by Ana-Tech in 1990 for
work performed for Micro-Blend . . . ." Ana-Tech continued to supply the labor force for
Micro-Blend's operations until 2001. At this time, Micro-Blend's Board decided to pay its
own employees rather than transact through Ana-Tech. Gibney contends that "Ana-Tech,
Inc., was supposed to be doing Micro-Blend Inc. [sic] payroll, however, the secretary of
Micro-Blend Inc., Terri Doyel[,] did all the so called payroll services" and that "[a]ppellee-Culver [Roy] took $4.93 million dollars from Micro-Blend, Inc. through Ana-Tech, Inc. under
the disguise that it was providing payroll services." Conversely, Roy argued that the
principal reason that Micro-Blend used Ana-Tech to provide its labor force was "Ana-Tech's
favorable workers' compensation experience rating." Roy further argues that Ana-Tech's
handling of Micro-Blend's labor force saved Micro-Blend $28,000 a year in workers'
compensation insurance premiums. (9)

II. Procedural Background

 Gibney filed his shareholder derivative and shareholder oppression actions against
Roy, Culver Interests, and Micro-Blend on November 27, 2000. Gibney joined Ana-Tech
on April 15, 2003. (10) The case was first tried to verdict in 2004, with the jury concluding that
Gibney and the other minority shareholders were entitled to $12,000,000 in actual and
exemplary damages and $4,000,000 in attorney's fees. However, in response to
appellees' motion to disregard the jury's findings and for a judgment non obstante verdicto,
the trial judge ordered a new trial on June 16, 2004. (11)

 The case was re-tried to a jury on the causes of action contained in Gibney's
seventh amended petition, which was filed on June 23, 2005. (12) On July 6, 2005, appellees
filed their third amended answer and asserted a counterclaim against Gibney, claiming
Gibney's derivative claims "were not preceded by reasonable inquiry, were and are
groundless and brought in bad faith; or groundless and brought for the purpose of
harassment; or groundless and interposed for an improper purpose" to cause unnecessary
delay or needless increase in the cost of litigation. In this filing, appellees also asserted
a myriad of affirmative defenses, including a statute of limitations defense. 

 After Gibney rested his case-in-chief, the trial judge granted appellees' motion for
a partial directed verdict on Gibney's fraud claims contained in paragraph thirteen of his
seventh amended petition on statute of limitations grounds. (13) Once appellees rested their
case-in-chief, the trial judge directed a verdict on Gibney's remaining shareholder
derivative claims, stating that Gibney had not produced any evidence as to damages. The
case went to the jury based solely on Gibney's shareholder oppression cause of action. 
The trial court submitted five questions to the jury regarding Gibney's shareholder
oppression cause of action. Those questions, and the jury's answers thereto, were as
follows:

 Question No. 1.


 Do you find from a preponderance of the evidence that Roy Culver,
Jr., since November 27, 1998, maliciously or wrongfully refused to allow
Michael Gibney to examine the books and records of Micro-Blend, Inc.?

 

 Answer: Yes or No: NO 


 Question No. 2. 


 Do you find from a preponderance of the evidence that Roy Culver,
Jr., since November 27, 1998, maliciously or wrongfully used his position as
the Chief Executive Officer of Micro-Blend, Inc., to award excessive salaries
and compensation to himself to the detriment of Michael Gibney?

 

 Answer: Yes or No: YES

 

 Question No. 3.

 

 Do you find from a preponderance of the evidence that Roy Culver,
Jr., since November 27, 1998, maliciously or wrongfully used his position as
the Chief Executive Officer of Micro-Blend, Inc., to award excessive salaries
and compensation to members of his family to the detriment of Michael
Gibney?

 

 Answer: Yes or No: YES

 

 Question No. 4.

 

 Do you find from a preponderance of the evidence that Roy Culver,
Jr., used his position as the Chief Executive Officer of Micro-Blend, Inc., to
maliciously or wrongfully direct the withholding of payment of dividends from
Micro-Blend, Inc., to Michael Gibney in 1998, 1999, and 2000?

 

 Answer: Yes or No: NO


 If you have answered any one of the preceding questions "YES," answer the
next question. If you have answered each of the preceding questions "NO,"
do not answer the next question.


 Question No. 5.


 What is the value of Michael Gibney's shares in Micro-Blend, Inc.?


 Answer in dollars and cents, if any.


 Answer: $4,000,000


 As evidenced above, the jury returned a verdict that was partially favorable to
Gibney. On August 4, 2005, Roy filed a motion to set aside the jury's findings to the
second and third questions contained in the jury charge. Furthermore, on August 29, 2005,
Roy, Ana-Tech, and Culver Interests filed a motion for judgment with the trial court
asserting that Gibney was entitled to a take nothing judgment as a matter of law on all of
his claims. On December 9, 2005, the trial court denied Roy's motion to set aside the
jury's findings.

 In its judgment signed on February 2, 2006, the trial court held that the jury's
findings constituted a finding that Roy had oppressed Gibney, a shareholder in Micro-Blend. Subsequently, the trial court awarded Gibney $250,000 in damages against Roy. (14)

 On March 6, 2006, Gibney filed a notice of appeal, and Roy filed a motion for new
trial. The trial court did not rule on Roy's motion for new trial, and it was subsequently
overruled by operation of law. See Tex. R. App. P. 33.1(b); see also Tex. R. Civ. P.
329b(c). Roy then filed notice of his cross-appeal on May 1, 2006. (15)

III. Standard of Review

 A legal sufficiency challenge may only be sustained when: (1) the record discloses
a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of
evidence from giving weight to the only evidence offered to prove a vital fact; (3) the
evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence
establishes conclusively the opposite of a vital fact. Uniroyal Goodrich Tire Co. v. Martinez,
977 S.W.2d 328, 334 (Tex. 1998). The evidence is no more than a scintilla and, in legal
effect, is no evidence "when the evidence offered to prove a vital fact is so weak as to do
no more than create a mere surmise or suspicion of its existence." Kindred v. Con/Chem.,
Inc., 650 S.W.2d 61, 63 (Tex. 1983). Conversely, more than a scintilla exists when the
evidence "rises to a level that would enable reasonable and fair-minded people to differ in
their conclusions." Transp. Ins. Co. v. Moriel, 879 S.W.2d 10, 25 (Tex. 1994). In
determining whether there is legally sufficient evidence to support the finding under review,
we must consider evidence favorable to the finding if a reasonable factfinder could, and
disregard evidence contrary to the finding unless a reasonable factfinder could not. City
of Keller v. Wilson, 168 S.W.3d 802, 827 (Tex. 2005).IV. Analysis

A. Gibney's Derivative Claims

 1. Gibney's Fraud Claims Against Roy and Culver Interests

 In his first issue on appeal, Gibney asserts that the trial court's directed verdict as
to his claims against Culver Interests and Roy was improper because the legal doctrines
of fraudulent concealment, continuing tort, and the discovery rule save his causes of action
from appellees' affirmative defense of statute of limitations. In support of his contention,
Gibney noted that the evidence at trial proved that Roy, through Culver Interests,
fraudulently took $2.75 million from Micro-Blend in 1996 and 1997, and that his cause of
action for fraud was timely filed. In addition, Gibney notes that (1) he did not discover the
existence of a previously unknown "Culver Interests 'number 2'" until after the lawsuit was
filed, (2) the evidence demonstrated that appellees engaged in fraudulent concealment,
which would counter appellees' affirmative defense of statute of limitations, and (3)
appellees failed to put on evidence to support their statute of limitations claim. 

 Appellees countered by arguing that (1) Gibney failed to raise a fact issue that
Culver Interests was a sham organization, (2) Gibney failed to establish the essential
elements of his causes of action for fraud and breach of fiduciary duty, and (3) the facts
adduced at trial established that Gibney's fraud cause of action accrued more than four
years before Gibney filed suit. 

 a. Applicable Law

 A cause of action for injury to the property of a corporation or for impairment or
destruction of its business is vested in the corporation, as distinguished from its
shareholders. Redmon v. Griffith, 202 S.W.3d 225, 236 (Tex. App.-Tyler 2006, pet.
denied) (citing Davis v. Sheerin, 754 S.W.2d 375, 381 (Tex. App.-Houston [1st Dist.] 1988,
writ denied)); see Murphy v. Campbell, 964 S.W.2d 265, 268 (Tex. 1997); Hajdik v.
Wingate, 753 S.W.2d 199, 201 (Tex. App.-Houston [1st Dist.] 1988), aff'd, 795 S.W.2d
717 (Tex. 1990). To recover for wrongs done to the corporation, the shareholder must
bring the suit derivatively in the name of the corporation so that each shareholder will be
made whole if the corporation obtains compensation from the wrongdoer. Redmon, 202
S.W.3d at 236-37 (citing Faour v. Faour, 789 S.W.2d 620, 621-22 (Tex. App.-Texarkana
1990, writ denied)). 

 Statute of limitations is an affirmative defense. Tex. R. Civ. P. 94. A defendant
bears the initial burden to plead, prove, and secure findings to sustain its plea of
limitations. See Woods v. William M. Mercer, Inc., 769 S.W.2d 515, 517 (Tex. 1988); see
also Twist v. Garcia, No. 13-05-00321-CV, 2007 Tex. App. LEXIS 7187, at *8 (Tex.
App.-Corpus Christi Aug. 30. 2007, no pet.) (mem. op.). Fraud claims have a four year
statute of limitations period from the day the cause of action accrues. Tex. Civ. Prac. &
Rem. Code. Ann. § 16.004(a)(4) (Vernon 2002). Generally, the accrual date of a cause of
action is a question of law. See Moreno v. Sterling Drug, Inc., 787 S.W.2d 348, 351 (Tex.
1990) (the question of when a cause of action accrues is a judicial one unless defined by
the legislature). The accrual date is when the plaintiff knew or should have known of the 
wrongfully caused injury. See KPMG Peat Marwick v. Harrison County Hous. Fin. Corp.,
988 S.W.2d 746, 749 (Tex. 1999); see also Earle v. Ratliff, 998 S.W.2d 882, 888 (Tex.
1999). 

 b. Discussion

 On appeal, Gibney contends that appellees failed to present evidence to the trial
court in support of their statute of limitations defense. Appellees direct this Court to three
exhibits introduced into evidence that serve as adequate support for their statute of
limitations defense as to Culver Interests. 

 The first exhibit referenced by appellees, marked Defendant's Exhibit 45, is an inter-office memorandum from Roy to Gibney and Mike Lucas dated May 25, 1990. In the
memorandum, Roy references personal expense accounts for three employees, including
$5,103.94 paid to Gibney, and salaries payable to a group of employees, including
$7,437.36 payable to Gibney for 250.5 hours worked. Appellees' second exhibit, marked
Defendant's Exhibit 72, is a memorialization of the Micro-Blend Board meeting on August
29, 1994. The following language, in this document, makes clear that Gibney participated
in the Board meeting: "All members were present except Troy Kemp. . . . 4. Motion by
Gibney and Collins, seconded, that CEO provide financial support, limited manufacturing,
and standard drawings to advance faster delivery of equipment." Finally, appellees' third
exhibit, marked Defendant's Exhibit 74, is a memorialization of the Micro-Blend Board
meeting on January 13, 1995. In this document, Micro-Blend's Board agreed to contract
with Culver Interests for the construction and manufacture of five skids, three for pending
systems sold and two for anticipated sales, at a cost of 12% over actual cost. The record
reflects that these documents were contained within the business records of Micro-Blend.

 Gibney contends that Micro-Blend entered into a contract with Culver Interests to
manufacture skids and that Micro-Blend employees actually manufactured the skids while
Culver Interests pocketed the money made from the manufacturing work. As such, Gibney
contends that Roy, specifically, perpetuated a fraud on Micro-Blend with this arrangement. 
Based on the evidence adduced at trial, the date of the Board's decision to enter into the
manufacturing contract with Culver Interests--January 13, 1995--governs our statute of
limitations analysis because it is the date in which the alleged fraud began; the day when
the interests of Micro-Blend's Board members allegedly began to run counter to the
interests of Gibney and the other minority shareholders of Micro-Blend. 

 The statute of limitations period for fraud is four years from the accrual date. Tex.
Civ. Prac. & Rem. Code. Ann. § 16.004(a)(4). The record reflects that Gibney filed his
original petition alleging fraud, among other claims, on November 27, 2000. The record
further reflects that appellees, in their second amended answer filed on February 10, 2005,
pleaded that Gibney's causes of action for fraud were barred by the statute of limitations. 
Therefore, based on the evidence presented at trial, Gibney needed to have filed his
original petition by January 13, 1999, in order to comply with the applicable statutes of
limitation. Because Gibney did not file his original petition by January 13, 1999, it is clear
to this Court that Gibney's fraud claims against Roy and Culver Interests were barred by
statute of limitations.

 Gibney, however, argues that the statute of limitations on his fraud cause of action
against Roy and Culver Interests was "deferred," i.e., tolled by the legal doctrines of
fraudulent concealment, continuing tort, and the discovery rule. In support of his
contention, Gibney references the following language in his seventh amended petition: "All
Plaintiff's claims are continuing and ongoing and Plaintiffs asserts [sic] fraudulent
concealment and discovery rule to any Defendant's claim of limitations." (16) On appeal,
Gibney simply states that his causes of action for fraud and breach of fiduciary duty "were
clearly timely filed" and that the trial testimony of Doyel regarding appellees' document
destruction policies establish his claim for fraudulent concealment. Gibney has not
provided this Court with a clear and concise argument linking the evidence adduced at trial
to his contention that the statutes of limitation are tolled in accordance with the discovery
rule or the continuing tort doctrine. See Tex. R. App. P. 38.1(h). We therefore conclude
that Gibney has inadequately briefed these theories; thus, these theories are waived. See
id. 

 Gibney has, however, provided argument and authority as to his fraudulent
concealment contention. In support of his contention that an accrual date can be deferred
by fraudulent concealment, Gibney cites to the Texas Supreme Court's holding in S.V. v.
R.V., 933 S.W.2d 1, 4 (Tex. 1996). Gibney has also provided this Court with citations to
the trial testimony of Doyel chronicling the document retention policies of Micro-Blend.

 In S.V., the supreme court noted that the accrual of a cause of action is deferred in
two types of cases: (1) in those involving allegation of fraud or fraudulent concealment,
accrual is deferred because a person cannot be permitted to avoid liability for his actions
by deceitfully concealing wrongdoing until limitations has run; and (2) in those cases in
which the discovery rule applies, "the nature of the injury occurred is inherently
undiscoverable and the evidence of injury is objectively verifiable." S.V., 933 S.W.2d at
6.

 "The fraudulent concealment doctrine, unlike the discovery rule, resembles equitable
estoppel." Mitchell Energy Corp. v. Bartlett, 958 S.W.2d 430, 439 (Tex. App.-Fort Worth
1997, pet. denied) (fraudulent concealment is based on the doctrine of equitable estoppel;
the doctrine tolls or suspends the running of limitations after it has begun because the
defendant has concealed facts necessary for the plaintiff to know that he had a cause of
action). Moreover, the plaintiff asserting fraudulent concealment must have reasonably
relied on the defendant's lies or improper silence; once a plaintiff knows or should have
known of the deceit, reliance is no longer reasonable, and the toll effect ends. Id. In
essence, Gibney is required to show: (1) the existence of the underlying "tort"; (2) the
defendant's knowledge of the tort; (3) the defendant's use of deception to conceal the tort;
and (4) the plaintiff's reasonable reliance on the deception. Id.; see also Cass v. Stephens,
156 S.W.3d 38, 64 (Tex. App.-El Paso 2004, pet. denied) (holding that fraudulent
concealment applies to any cause of action).

 Doyel's testimony reflects that she became the secretary and custodian of records
for Micro-Blend in 1995, the custodian of records for Ana-Tech in 2001, and the custodian
of records for Culver Interests in 2002. Doyel also noted the following:


 Q: Is there a way where you kept like a time log about how many hours that
you spent working for Micro-Blend, Ana-Tech, Culver Interests and Roy
Culver?

 

 A: I kept a time sheet but I never worked for Roy Culver--of hours that I
worked on things for the different companies during the day.

 

 . . . .

 

 Q: Okay. Now, the time sheet that we are talking about, are they still in
existence or have they been destroyed?

 

 A: We have a retention policy--

 

 THE COURT: Just answer the question.

 

 . . . .

 

 Q: Are all those time sheets available?

 

 A: No, sir; they're not.

 

 Q: Who destroyed them?

 

 A: I believe I did in the course of business.

 

 . . . .

 

 Q: How many of those [source documents] have you destroyed?

 

 A: Just invoicing. Time sheets were destroyed as time went on. I have old
detail trial balances, accounts receivable, accounts payable records, payroll
journals.

 

 Q: How about backup records [to your accounting and recording
procedures]? Did you destroy those too?

 

 A: As years went on.

 

 . . . .

 

 Q: Can you tell us whether you are able to determine, for example, the
number of hours that a typical employee has worked over a period of time
without a source document?

 

 A: Not right now, no, sir.

 

 . . . .

 

 Q: Did Roy Culver know about your destruction of documents?

 

 A: We've never discussed it, but, yes, I'm sure he saw me shredding
documents.

 

 . . . .

 

 Q: And the destruction of documents we're talking about started in 1989? 
Did it start in 1989?

 

 A: For Ana-Tech Company, yes, sir.

 

 Q: And for Micro-Blend Incorporated, when did destruction of the documents
start?

 

 A: It's a general course of business, so it would be done every year once a
year for previous years back.

 

 . . . .

 

 Q: What year did you start destroying documents for Micro-Blend
Incorporated?

 

 A: I don't believe anything was destroyed until probably 1995 or '96.

 Despite Doyel's testimony about Micro-Blend's document retention policies, Gibney 

has not established the required elements for fraudulent concealment, as intimated in
Mitchell Energy Corp. and Cass. See Mitchell Energy Corp., 958 S.W.2d at 439; see also
Cass, 156 S.W.3d at 64. Gibney has failed to identify the nature of the documents that
were allegedly destroyed, how the alleged destruction of said documents prejudiced his
causes of action, and that appellees destroyed said documents in an effort to conceal them
from Gibney. Furthermore, Doyel's testimony establishes that Micro-Blend destroyed such
files on a specified date within the ordinary course of business. Considering his service
on the Board and as a Vice-President of Micro-Blend, Gibney should have known of Micro-Blend's document retention policy. (17) Given that Gibney acknowledged that "there was
something wrong" when he left Micro-Blend in 1995, this Court is not persuaded by
Gibney's contention that because of his alleged attenuated involvement with Micro-Blend's
day-to-day activities, he was surprised to find out about these practices. 

 In addition, the record reflects that Gibney submitted to the trial court an instruction
on spoliation of evidence to be included in the jury charge, which the trial court refused to
submit to the jury. "[W]hen a party improperly destroys evidence, trial courts may submit
a spoliation presumption instruction." See Trevino v. Ortega, 969 S.W.2d 950, 960 n.4
(Tex. 1998) (Baker, J., concurring) (noting that the decision to issue this instruction is a
legal determination that occurs after the trial court concludes "that there was a duty to
preserve evidence, the spoliating party breached that duty, and the destruction prejudiced
the nonspoliating party") (citing Watson v. Brazos Elec. Power Coop., Inc., 918 S.W.2d
639, 643 (Tex. App.-Waco 1996, pet. denied)) (emphasis added). In declining to include
a spoliation presumption instruction, the trial court implicitly concluded that Gibney had not
established the necessary prerequisites outlined in Trevino. See id. Gibney himself
testified that he was able to review bank statements, tax returns, checks, and other
relevant Micro-Blend documents at various points in time, which undermines his fraudulent
concealment contention. We therefore conclude that Gibney has failed to establish that
appellees destroyed evidence to conceal information from Gibney that ultimately prejudiced
his case. Because Gibney has failed to establish his fraudulent concealment, continuing
tort, or discovery rule contentions and because he did not file his original petition within the
four-year statute of limitations period, the trial court did not err in concluding that Gibney's
fraud claims against Roy and Culver Interests were time barred. Accordingly, we overrule
Gibney's first issue.

 2. Remaining Derivative Claims Against Roy and Ana-Tech

 In his second issue on appeal, Gibney argues that the statute of limitations should
not have barred his claim that Roy "fraudulently took" $4.93 million dollars from Micro-Blend and gave it to Ana-Tech "under the disguise of payroll services." Gibney does admit
that "[t]he only potential limitations issue is for the period 1994 through April 15, 1999." 
However, Gibney also argues that appellees did not put on any evidence of their limitations
defense and that his claims are deferred by the discovery rule, fraudulent concealment,
and the continuous tort doctrines. Once again, appellees countered by arguing that (1)
Gibney failed to raise a fact issue that Ana-Tech was a sham organization, (2) Gibney
failed to establish the essential elements of his causes of action for fraud and breach of
fiduciary duty, specifically damages, and (3) the facts adduced at trial established that
Gibney's fraud and breach of fiduciary duty causes of action accrued more than four years
before Gibney filed suit. 

 However, Gibney has mischaracterized the trial court's directed verdicts. The record
reflects that the trial court directed a verdict as to Gibney's remaining derivative claim of
breach of fiduciary duty against Roy and Ana-Tech on no-evidence grounds with respect
to damages. (18) Because Gibney has failed to properly address the trial court's directed
verdict with respect to the remaining derivative claims against Roy and Ana-Tech, we
conclude that Gibney has inadequately briefed this issue. See Tex. R. App. P. 38.1(h). In
any event, we will analyze these claims within the context of a legal sufficiency review. 

 a. Applicable Law

 To establish common law fraud, a plaintiff must prove: "(1) a material
representation was made; (2) the representation was false; (3) when the representation
was made, the speaker knew it was false or made it recklessly without any knowledge of
the trust and as a positive assertion; (4) the representation was made with the intention
that it be acted upon by the other party; (5) the party acted in reliance upon the
representation; and (6) the party suffered injury." Johnson & Higgins of Tex., Inc. v.
Kenneco Energy, Inc., 962 S.W.2d 507, 524 (Tex. 1998). On the other hand, the elements
of a breach of fiduciary duty claim are: (1) a fiduciary relationship between the plaintiff and
defendant; (2) the defendant breached his fiduciary duty to the plaintiff; and (3) the
defendant's breach resulted in injury to the plaintiff or benefit to the defendant. See Punts
v. Wilson, 137 S.W.3d 889, 891 (Tex. App.-Texarkana 2004, no pet.); see also Los Cucos
Mexican Cafe, Inc. v. Sanchez, No. 13-05-578-CV, 2007 Tex. App. LEXIS 3408, at *16
(Tex. App.-Corpus Christi May 3, 2007, no pet.) (mem. op.).

 b. Discussion

 The trial court directed a verdict in favor of appellees as to Gibney's remaining
causes of action against Roy and Ana-Tech, stating that Gibney failed to prove damages. 
With respect to damages, the following exchange occurred:

 THE COURT: . . . . [Y]ou still haven't told me what would be the
measure of damages for Micro-Blend, because
even if that were so, then for the work to have
been done, it had to have been paid for. There
had to be a loss to someone. Micro-Blend would
have had to be paying something for it. From
the onset in this case, you've said all the
damages, every penny paid to Ana-Tech are
damages in this case. Somebody was getting
some skids. Somebody was selling a profit. 
There was a cost involved in selling that product. 
Now, with all the money coming in, there's X
amount of dollars. And a product is being
delivered. Somehow there had to be a cost to it,
and you just seem to write that out completely in
your theory on this case. And I can't do that.


 [Counsel for Gibney]: Judge, that's a disputed issue of fact for the jury
to decide.

 

 THE COURT: To be a disputed issue of fact, there has to be
evidence which reasonable minds could not
differ, Counsel, and there's no evidence to
support that figure, okay, in this particular case. 
All right. All right. 


 . . . .


 THE COURT . . . . I'm going to grant your request [motion for
directed verdict]. I don't think there's any
evidence regarding the damages.


 At trial, Gibney repeatedly argued that Ana-Tech was a sham organization that did
not perform any services for the benefit of Micro-Blend; rather, Gibney asserted that it was
Micro-Blend who was actually performing the services. Throughout trial, Gibney claimed
that all money received by Ana-Tech from Micro-Blend was damages and that the
measurement and calculation of the damages was a fact issue for the jury to decide. 
Appellees countered by presenting evidence that Ana-Tech's "payroll services" conferred
a benefit to Micro-Blend and that Ana-Tech was not a sham organization. Furthermore,
appellees noted that although the correct measure of damages was benefit of the bargain,
Gibney failed to plead any theory for the measurement of damages. 

 Gibney offered the expert testimony of Wendy Kurz, a certified public accountant,
to establish that Micro-Blend made $4.93 million in payments to Ana-Tech for payroll
services. Kurz testified that she was able to make this determination by matching up
amounts that were in Mirco-Blend's expenditures to amounts recorded in Ana-Tech's tax
returns. However, Gibney failed to provide any evidence that Ana-Tech did not confer a
benefit to Micro-Blend in exchange for the $4.93 million in payments made. Gibney only
presented his own self-serving testimony that he believed that Ana-Tech was a sham
organization and that Ana-Tech had not conferred any benefit to Micro-Blend. 

 In fact, Gibney has maintained throughout trial and on appeal that he was not
personally involved in the day-to-day operations of Micro-Blend, which undermines his
alleged personal knowledge of the relationship between Micro-Blend and Ana-Tech. 
Otherwise, Gibney failed to present additional evidence as to the appropriate measure for
damages, that Ana-Tech was a sham organization, and that Micro-Blend sustained any
damages. Because of this, Gibney failed to establish the damages element for either of
his derivative causes of action. See Johnson & Higgins of Tex., Inc., 962 S.W.2d at 524
(noting that to establish common law fraud, a plaintiff must prove, among other things, that: 
"(6) the party suffered injury."); see also Punts, 137 S.W.3d at 891 (stating that among the
elements for a breach of fiduciary duty claim is a requirement that the defendant's breach
results in an injury to the plaintiff). Therefore, we conclude that the trial court did not err
in granting appellees' motion for directed verdict as to Gibney's remaining derivative claims
against Roy and Ana-Tech. Accordingly, we overrule Gibney's second issue. 

 3. The Trial Court's Directed Verdict on Gibney's Derivative Claims

 In his third issue on appeal, Gibney asserts that the trial court's directed verdict on
his derivative claims is not supported by the record. Specifically, Gibney notes that tax
returns, bank statements, checks, and other documents admitted into evidence establish
that Roy, personally and through his other companies, siphoned money from Micro-Blend. 
Gibney also contends that Roy's companies provided no services for Micro-Blend even
though Micro-Blend paid Roy's companies for various services and that Micro-Blend's tax
returns do not reflect various other sources of income. In addition, Gibney argues that the
trial court's directed verdicts on his derivative claims of fraud and breach of fiduciary duty
were "clearly premature and improper and requires [sic] reversal." Conversely, appellees
contend that Gibney's most recent live pleading, his seventh amended petition, is defective
in that Gibney failed to plead any measure of damages to support a judgment. Appellees
also argue that the trial court's directed verdicts were not "premature" because the trial
court is authorized to direct a verdict in favor of a defendant once the plaintiff rests his
case-in-chief and the evidence adduced at that point conclusively proves facts that
establish the right of the movant, or negates the right of the nonmovant, to judgment. a. Applicable Law

 A directed verdict is proper only under limited circumstances: (1) when the evidence
conclusively establishes the right of the movant to judgment or negates the right of the
opponent or (2) when the evidence is insufficient to raise a material fact issue. See
Prudential Ins. Co. v. Fin. Review Servs., Inc., 29 S.W.3d 74, 77 (Tex. 2000); Ray v.
McFarland, 97 S.W.3d 728, 730 (Tex. App.-Fort Worth 2003, no pet.); see also Kelly v.
Diocese of Corpus Christi, 832 S.W.2d 88, 90-91 (Tex. App.-Corpus Christi 1992, writ
dism'd w.o.j.). In reviewing a directed verdict, we must credit favorable evidence if
reasonable jurors could and disregard contrary evidence unless reasonable jurors could
not. See City of Keller, 168 S.W.3d at 827.

 If the question to be decided is whether the losing party at trial raised a material fact
issue, we consider all the evidence in a light most favorable to the party against whom the
verdict was instructed and disregard all contrary evidence and inferences. See Coastal
Transp. Co. v. Crown Cent. Petroleum Corp., 136 S.W.3d 227, 234 (Tex. 2004). In
essence, we give the losing party the benefit of all reasonable inferences created by the
evidence. See id. If we determine that any conflicting evidence of probative value raises
a material fact issue on any theory of recovery, then the directed verdict is improper
because such an issue is for the jury to resolve. See Szczepanik v. First S. Trust Co., 883
S.W.2d 648, 649 (Tex. 1994) (per curiam).

 Moreover, "[a] trial court may not properly direct a verdict, on its own motion, if all
of the evidence has not been presented." Wedgeworth v. Kirskey, 985 S.W.2d 115, 116
(Tex. App.-San Antonio 1998, pet. denied) (citing Nassar v. Hughes, 882 S.W.2d 36, 38
(Tex. App.-Houston [1st Dist.] 1994, writ denied)). It is reversible error if the trial court
directs a verdict before the plaintiff has presented all of his evidence. Id. (citing Buckner
v. Buckner, 815 S.W.2d 877, 878 (Tex. App.-Tyler 1991, no writ)).

 b. Discussion

 Gibney argues that the trial court's directed verdicts on his derivative claims were
premature and improper because the trial court directed the verdicts in favor of appellees
based on limitations before appellees had presented their evidence. Gibney, however, has
not provided this Court with any authority supporting his contention that the trial court must
wait until the defendant has presented its case-in-chief to direct a verdict. See Tex. R. App.
P. 38.1(h). 

 In fact, several Texas courts have concluded that the trial court may direct a verdict
once the plaintiff has presented its case-in-chief. See Wedgeworth, 985 S.W.2d at 116;
Nassar, 882 S.W.2d at 38; Buckner, 815 S.W.2d 877, 878. It is only reversible error if the
trial court directed a verdict without allowing the plaintiff to present all of its evidence. See
Wedgeworth, 985 S.W.2d at 116. The record reflects that the trial court's directed verdicts
occurred after Gibney was afforded the opportunity to present all of his evidence to the trial
court. Therefore, the trial court's directed verdicts were not premature. (19) Additionally,
because we have already determined that Gibney's derivative claims fail, Gibney has failed
to present this Court with a material fact issue which would be reserved for a jury to decide. 
See Prudential Ins. Co., 29 S.W.3d at 77 (holding that a directed verdict is proper if the
plaintiff has failed to raise a material fact issue); Ray, 97 S.W.3d at 730 (same); see also
Kelly, 832 S.W.2d at 90-91 (same). Based on the foregoing, we conclude that the trial
court's directed verdicts on Gibney's derivative claims were neither premature nor
improper. Accordingly, we overrule Gibney's third issue. 

B. Gibney's Individualized Shareholder Oppression Claim

 1. Legal Sufficiency of the Jury's Findings of Excessive Compensation

 By his first issue on cross-appeal, Roy contends that the evidence in the record is
legally insufficient to support the jury's findings that Roy paid himself and his family
members excessive compensation. (20) On the other hand, Gibney asserts that the record
is devoid of any evidence that the compensation paid to Roy and his family members was
reasonable given that many of Roy's family members "had little or no education, no
licenses, no certifications, and/or disabled and qualified for any job, yet were averaging
over $70,000.00 per year in compensation, in Ingleside, Texas, with a population of about
nine (9) thousand people." (21) 

 As previously mentioned, questions two and three of the jury charge asked the
following:


 Question No. 2.


 Do you find from a preponderance of the evidence that Roy Culver, Jr., since
November 27, 1998, maliciously or wrongfully used his position as the Chief
Executive Officer of Micro-Blend, Inc., to award excessive salaries and
compensation to himself to the detriment of Michael Gibney? 

 

 Question No. 3.


 Do you find from a preponderance of the evidence that Roy Culver, Jr., since
November 27, 1998, maliciously or wrongfully used his position as the Chief
Executive Officer of Micro-Blend, Inc., to award excessive salaries and
compensation to members of his family to the detriment of Michael Gibney?

 

The jury responded in the affirmative to both questions. However, the evidence in the
record does not support the jury's conclusions.

 Gibney directs this Court to "Plaintiffs [sic] Exhibits 13 and 15" in support of his
contention that Roy and his family members received excessive compensation. These
exhibits are simply tax returns for Roy and his family members that demonstrate the
following:

Wages, Tips, and Other Compensation



Year Ending 2000
Year Ending 2001
Roy Culver, Jr.
$186,598.36 
$1,093,447.02
Troy Culver
$68,511.42
$77,558.52
Terry Doyel
$50,408.96 
$68,412.40
Dawn Spiegelhoff
$38,613.60
$45,989.96
Doug Culver 
$31,000.00
$67,140.99

 Roy included a similar chart with his motion to set aside the jury's findings, which
chronicled, in relevant part, the compensation paid to Micro-Blend employees. The chart
provided, in relevant part:


Name
Ana-Tech 2000
Micro-Blend 2001
Roy Culver, Jr. [CEO of Micro-Blend]
$195,652
$176,424
Mike Lucas [Board member]
164,332
112,543
J.K. Ramsey [Board member]
107,223
105,995
Troy Dean Culver
72,915
80,365
Terri Doyel
53,488
69,674
Dawn Spiegelhoff
40,440
45,989
Doug Culver
$ 31,000
$ 72,132

 Gibney asserts that he was paid $50,000 per year as a contract laborer for Micro-Blend at the time he left the company in 1995. (22) Based on the above mentioned salaries,
Gibney testified that "it shocked me to think that I'm making $50,000 and there's a
secretary making 80,000 or 70 or whatever, 75 or 78." Gibney relies solely on his listing
of compensation for each individual, his own testimony that the salaries were "shocking,"
and his contention that persons within minimal credentials in Ingleside, Texas, should not
make such salaries. This evidence is not enough.

 The factual scenario in the instant case has not been specifically addressed by
Texas courts. However, the Fifth Circuit, in Rutter v. Commissioner of Internal Revenue,
has held that the reasonableness of compensation paid by a corporation is a question of
fact and that each case turns on its own facts and circumstances. 853 F.2d 1267, 1271
(5th Cir. 1988). The Rutter court intimated the following factors for a reviewing court to
consider in the determination of reasonable compensation:

 (1) the employee's qualifications;

 

 (2) the nature, extent and scope of the employee's work;

 

 (3) the size and complexities of the business;

 

 (4) a comparison of salaries paid with gross income and net income;

 

 (5) the prevailing general economic conditions;

 

 (6) comparison of salaries with distributions to stockholders;

 

 (7) the prevailing rates of compensation for comparable positions in
comparable concerns; 

 

 (8) the salary policy of the taxpayer [corporation] as to all employees; and

 

 (9) in the case of small corporations with a limited number of officers[,] the
amount of compensation paid to a particular employee in previous years.


Id. (citing Owensby & Kritikos, Inc. v. Comm'r of Internal Revenue, 819 F.2d 1315, 1323
(5th Cir. 1987); Mayson Mfg. Co. v. Comm'r of Internal Revenue, 178 F.2d 115, 119 (6th
Cir. 1949)). The Rutter court further emphasized that no single factor is determinative and
that the reviewing court should consider and weigh the totality of the facts and
circumstances in determining reasonable compensation. Id. Moreover, "the action of the
Board of Directors of a corporation in voting salaries for any given period is entitled to the
presumption that such salaries are reasonable and proper." Mayson Mfg. Co., 178 F.2d
at 119. (23)

 a. Roy's Compensation

 Roy testified that he had graduated from high school, that he did not have any
relevant licenses or certifications, and that he could not build a skid. He further testified
that he received compensation from Ana-Tech and Micro-Blend; that he believed the
compensation received from Micro-Blend was reasonable given that the Board had
authorized the payment; and that the compensation received from Ana-Tech was money
owed to him from the winding up of Ana-Tech by virtue of his ownership of the company. 
Roy testified that he agreed to take checks for a couple thousand a week from Ana-Tech,
rather than taking a lump sum of $150,000. Roy's testimony reflected that he received
payments from both Ana-Tech and Micro-Blend for two or three years. Roy stated that he
received bonuses on three to five occasions for his work as the chief executive officer of
Micro-Blend, but that the bonuses were always awarded by vote of the Micro-Blend
Board. (24) Roy denied ever awarding himself a bonus.

 Gibney, however, failed to present evidence upon which the trial court or this Court
can compare and measure Roy's compensation. In fact, Gibney relies heavily on the fact
that he allegedly made only $50,000 per year at Micro-Blend and that Roy made
significantly more money than he did even though the idea for the company was his own. 
Given Roy's status as the chief executive officer of an apparently thriving business, it does
not appear unreasonable for Roy to receive $195,652 in compensation during 2000 and
$176,424 in compensation during 2001. (25) Furthermore, the evidence demonstrates that
Roy's compensation was authorized by the Board. The record does not contain sufficient
evidence to overcome the presumption that compensation decisions made by the Board
are reasonable and proper. See Mayson Mfg. Co., 178 F.2d at 119. Moreover, Gibney
has not presented any evidence as to the remaining elements intimated in Rutter in
establishing that Roy's compensation was excessive or unreasonable. See Rutter, 853
F.2d at 1271. 

 b. Doug Culver's Compensation

 At trial, Doug testified that he does not have any licenses or certifications, but that
he was trained to learn the systems used by Micro-Blend. With respect to Doug, Gibney
introduced Micro-Blend's tax returns to establish Doug's salary for 2000 and 2001: 
$31,000 and $72,132, respectively. (26) Doug further testified that he contributed $6,000 to
$7,000 worth of metering equipment to Micro-Blend and that he received shares of Micro-Blend stock in exchange for his contribution. Doug also noted that he made $9.00 per hour
less than other technicians at Micro-Blend because "Roy wanted to make sure that he
wasn't accused of padding the payroll with a kin folk." No additional evidence was
presented as to the remaining elements established in Rutter, especially evidence
regarding prevailing rates of compensation for comparable positions in comparable
companies. See id. In fact, we have nothing to compare Doug's compensation to other
than Gibney's bald assertion that the compensation provided was "shocking." Gibney has
not presented any evidence as to the remaining elements intimated in Rutter in
establishing that Doug's compensation was excessive or unreasonable. See id.

 c. Terri Doyel's Compensation

 Doyel testified that she graduated from high school, but that she does not have any
special licenses or certifications to manage the bookkeeping for Micro-Blend. On appeal,
Gibney directs us to Micro-Blend's tax returns showing Doyel's salaries during 2000 and
2001: $53,488 and $69,674, respectively. (27) Clearly, within the context of Rutter, evidence
of an employee's salary and their qualifications alone are not dispositive. See id.
Therefore, based on our review of the record, Gibney did not establish that Doyel's
compensation was excessive or unreasonable.

 d. Dawn Spiegelhoff's Compensation

 At trial, Gibney failed to establish Spiegelhoff's education level or qualifications. 
Gibney merely asserts on appeal that Spiegelhoff had "little or no education, no license,
no certification, and who [sic] job was to answer the telephone . . . ." Again, Gibney directs
us to Micro-Blend's tax returns for the years 2000 and 2001 to establish Speigelhoff's
salary: $40,440 and $45,989, respectively. (28) The evidence indicates that Spiegelhoff was
responsible for answering the telephone and filing at Micro-Blend. Here, Gibney relied
solely on the amount of compensation to establish that Speigelhoff received excessive or
unreasonable compensation. However, the Rutter court established that one element
alone is not dispositive and that a reviewing court must consider the facts and
circumstances in totality. See id. Therefore, based on our review of the record,
Speigelhoff's compensation was neither excessive nor unreasonable. 

 e. Troy Culver's Compensation 

 With respect to Troy Culver's compensation, Gibney testified that Troy worked for
Micro-Blend during a portion of Gibney's tenure at Micro-Blend from 1992 to 1995. Gibney
testified that Troy "swept the shop and cleaned up." Gibney further testified that Troy
sustained a "brain damage-type injury" from a motorcycle accident, but that he remained
a Micro-Blend employee even after the injury. As previously mentioned, Troy received
$72,915 in compensation during the year 2000 and $80,365 in compensation for the year
2001. (29) Again, Gibney relies heavily on the amount of compensation alone to establish
excessive or unreasonable compensation. As was the case earlier, this evidence alone
is not enough. See id. The evidence demonstrates that Troy, despite his impairment, was
responsible for assembling systems, which included complicated wiring components. On
appeal, Roy noted that Troy's compensation increased because he was paid overtime,
which was commensurate with Troy's increased responsibility at Micro-Blend. Thus,
Gibney has not established that the Board was unreasonable in authorizing Troy Culver's
salaries in 2000 and 2001.

 In sum, Gibney has failed to present sufficient evidence to overcome the
presumption that the compensation decisions of the Micro-Blend Board with respect to
Roy, Doug, Troy, Doyel, and Spiegelhoff were reasonable and proper. See Mayson Mfg.
Co., 178 F.2d at 119. Gibney continually argues that the compensation afforded these
individuals was excessive in "Ingleside, Texas, with a population of about nine (9) thousand
people." However, Gibney has not provided this Court with sufficient evidence showing
either the average compensation scheme in Ingleside, Texas, or compensation schemes
for comparable positions with comparable companies. Gibney relies solely on the amount
of compensation provided and his own self-serving testimony that the compensation
provided was "shocking" to establish that the compensation provided to Roy and his family
members was excessive or unreasonable. 

 It is clear to this Court that there is a complete absence of vital fact that the
compensation paid to Roy and his family members was excessive or unreasonable;
therefore, there is insufficient evidence to support the jury's finding that Roy maliciously or
wrongfully used his position as chief executive officer of Micro-Blend to award excessive
salaries to himself and his family members "to the detriment of Michael Gibney." See
Uniroyal Goodrich Tire Co., 977 S.W.2d at 334 (holding that a legal sufficiency challenge
may be sustained when the record discloses a complete absence of evidence of a vital
fact). Accordingly, we sustain Roy's first issue on cross-appeal.

 2. The Trial Court's Finding of Shareholder Oppression (30)

 By his second issue on cross-appeal, Roy argues that because the evidence is
legally insufficient as to the jury's findings of excessive compensation, the trial court
abused its discretion in concluding that Gibney was oppressed as a minority shareholder. 
Roy further contends that no shareholder oppression occurred as a matter of law. Gibney
asserts that the trial court's finding of shareholder oppression is supported by two separate
and independent jury answers which provided that Roy maliciously and wrongfully used his
position as the chief executive officer of Micro-Blend to award excessive salaries and
compensation to himself and to members of his family. (31) Finally, Gibney argues that the
siphoning off of the profits of a "close" corporation as excessive salaries or bonus
payments for the sole benefit of the majority shareholders and to the detriment of the
minority shareholders would constitute oppressive conduct. (32) 

 a. Applicable Law

 Whether certain acts were performed is a question of fact, but the determination of
whether such acts constitute shareholder oppression is usually a question of law for the
court. Willis v. Bydalek, 997 S.W.2d 798, 801 (Tex. App.-Houston [1st Dist.] 1999, pet.
denied); Davis, 754 S.W.2d at 380-81. We review the trial court's legal conclusions de
novo. BMC Software Belgium, N.V. v. Marchand, 83 S.W.3d 789, 794 (Tex. 2002); see
Pegasus Energy Group, Inc. v. Cheyenne Petroleum Co., 3 S.W.3d 112, 121 (Tex.
App.-Corpus Christi 1999, pet. denied) ("Legal conclusions of the trial court are always
reviewable and the appellate court is not obligated to give any particular deference to those
conclusions."). Specifically, we review the trial court's legal conclusions drawn from the
facts to determine their correctness. Marchand, 83 S.W.3d at 794. If the reviewing court
determines that a conclusion of law is erroneous, but the trial court rendered a proper
judgment, then the erroneous conclusion of law will not require reversal. Id.

 In Davis, the court of appeals defined "oppressive conduct" as follows:

 1. majority shareholders' conduct that substantially defeats the minority's
expectations that, objectively viewed, were both reasonable under the
circumstances and central to the minority shareholder's decision to join the
venture; or

 

 2. burdensome, harsh, or wrongful conduct; a lack of probity and fair dealing
in the company's affairs to the prejudice of some members; or a visible
departure from the standards of fair dealing and a violation of fair play on
which each shareholder is entitled to rely.


754 S.W.2d at 381-82; see also Willis, 997 S.W.2d at 801. Courts must exercise caution
in determining what shows oppressive conduct. Willis, 997 S.W.2d at 801. A minority
shareholder's reasonable expectations must be balanced with the corporation's need to
exercise its business judgment and run its business efficiently. Id. Therefore, a
corporation's officers and directors are afforded rather broad latitude in conducting
corporate affairs despite the existence of a minority-majority fiduciary duty. Id. 

 However, "[c]ourts take an especially broad view of the application of oppressive
conduct to a closely-held corporation, where oppression may more easily be found." 
Redmon, 202 S.W.3d at 234 (quoting Davis, 754 S.W.2d at 381). Additionally, majority
shareholders are sometimes said to stand in a fiduciary relationship with both the
corporation that they control and with minority shareholders. See DeBord v. Circle Y of
Yoakum, Inc., 951 S.W.2d 127, 133 (Tex. App.-Corpus Christi 1997), rev'd on other
grounds, Stary v. DeBord, 967 S.W.2d 352 (Tex. 1998). 

 b. Discussion

 In the instant case, Gibney relies heavily on the second prong of the shareholder
oppression analysis as set forth in Davis. Gibney only presented evidence as to the first
prong--the defeat of the minority shareholder's reasonable expectations by the majority
shareholder--within the context of dividend payments. In its answer to question four of the
jury charge, the jury concluded that Roy did not maliciously or wrongfully withhold dividend
payments to Gibney from 1998 to 2000. As previously noted, Gibney testified that he
remained a contract employee with Micro-Blend, earning $1,000 per week, because he
"was expecting big paybacks from the dividends." The record reflects that Gibney chose
to not become a salaried employee of Micro-Blend. The record further reflects that Gibney
received almost $420,000 in stock-related payments from Micro-Blend from 1995 to 2004. 
In fact, the record includes checks from Micro-Blend to Gibney for the following dates and
amounts:


Date
Amount
Reason Described on the Check
April 12, 1995
$13,475.00
Partial Distribution
January 10, 1996
$97,070.61
48% of Profits for Year Ending 12-31-1996
April 18, 2001
$57,419.32
Dividend of $3.2379924 per share on 17,733
shares
April 24, 2002
$57,419.32
Dividend of $3.2379924 per share on 17,733
shares
January 1, 2003
$57,419.32
Dividend of $3.2379924 per share on 17,733
shares
February 25, 2003
$57,419.32
Dividend of $3.2379924 per share on 17,733
shares
February 26, 2003
$44,332.50
Dividend of $2.50 per share
February 14, 2004
$36,466.00
$2.00 per share dividend on 17,733 shares

 The record also contains checks from Micro-Blend to other Micro-Blend
shareholders dating from 1995 to 2004. Like Gibney, no other Micro-Blend shareholder
received cash distributions from Micro-Blend during the 1998 to 2000 time period
referenced in the jury charge. Clearly, Gibney was neither singled out nor oppressed, as
to dividend distributions at any time. In addition, Micro-Blend's Board was not obligated
to issue yearly dividends to Micro-Blend shareholders, according to article VI of Micro-Blend's bylaws. (33) See Tex. Bus. Corp. Act Ann. art. 2.38-1 (Vernon 2003) (noting that
the board of directors may, not shall, authorize and the corporation may, not shall, pay
share dividends to shareholders subject to any restrictions in the corporation's articles of
incorporation or any restrictions set forth in the Texas Business Corporation Act). 
Therefore, based on our review of the record, the jury's verdict as to question four of the
jury charge is supported by the evidence in the record. In addition, the record reflects that
Gibney's expectations as the minority shareholder were not defeated by the majority
shareholders. See Davis, 754 S.W.2d at 381-82. 

 With respect to the second prong of the shareholder analysis set forth in Davis,
Gibney alleged throughout the trial and on appeal that Roy maliciously or wrongfully denied
him access to the books and records of Micro-Blend. See id. If true, this action would
most certainly be construed as "burdensome, harsh, or wrongful conduct; a lack of probity
and fair dealing in the company's affairs to the prejudice of some members; or a visible
departure from the standards of fair dealing and a violation of fair play on which each
shareholder is entitled to rely." Id. Article 2.44 of the Texas Business Corporation Act
provides the following:

 Any person who shall have been a shareholder for at least six (6) months
immediately preceding his demand, or shall be the holder of at least five per
cent (5%) of all outstanding shares of a corporation, upon written demand
stating the purpose thereof, shall have the right to examine, in person or by
agent, accountant, or attorney, at any reasonable time or times, for any
proper purpose, its relevant books and records of account, minutes, and
share transfer records, and to make extracts therefrom.


Tex. Bus. Corp. Act Ann. art. 2.44(c) (Vernon Supp. 2007) (emphasis added). Article 2.44
further provides that if a corporation refuses to allow such a shareholder access to its
books and records, the corporation shall be liable to the shareholder for all costs and
expenses, including attorney's fees, incurred in defending his rights under that Article. Id.
art. 2.44(D). In addition, the corporation would be liable for any other remedies afforded
by law. Id.

 After hearing all the evidence, the jury concluded, in response to question one of
the jury charge, that Roy did not maliciously or wrongfully prevent Gibney from inspecting
Micro-Blend's books and records. The evidence in the record supports the jury's finding. 
Roy testified that only on two or three occasions did Gibney contact him and that Gibney
did not send any letters to Micro-Blend requesting to examine Micro-Blend's books and
records. Roy further noted that as far as he knew Doyel, his secretary, did not receive any
letters from Gibney concerning Micro-Blend's books and records; Doyel corroborated Roy's
testimony as to the lack of written requests for inspection from Gibney. And, although
Gibney asserted throughout trial and on appeal that he made numerous requests orally
and in writing to inspect Micro-Blend's books and records, the record does not contain
documentation from Gibney reflecting a desire and stating a proper purpose for the
inspection in compliance with article 2.44 of the Texas Business Corporation Act. See id.
art. 2.44(c). Therefore, the jury's verdict as to question one of the jury charge is supported
by the evidence in the record. Based on the foregoing, Gibney has not established that
Roy engaged in burdensome or wrongful conduct that would constitute a claim for
shareholder oppression. See Davis, 754 S.W.2d at 381-82. Because Gibney has not
established either of the two prongs in Davis, we conclude that the trial court abused its
discretion in concluding that Gibney had successfully established a claim for shareholder
oppression against Roy and in awarding Gibney $250,000 in damages. Accordingly, we
sustain Roy's second issue on cross-appeal. 

 Because we have concluded that Gibney has not established a claim for
shareholder oppression against Roy, we need not address Roy's third issue on cross-appeal pertaining to the propriety of awarding individual damages to Gibney. See Tex. R.
App. P. 47.1.

 3. Pre-Judgment Interest

 Finally, in his third issue on appeal, Gibney argues that the trial court erred in
denying him pre-judgment interest because the trial court concluded that he was entitled
to relief for shareholder oppression, and because he properly pleaded for pre-judgment
interest. Because we have concluded that Gibney is not entitled to a judgment on either
his derivative claims or his shareholder oppression claims and because Gibney's claims
were purely economic in nature, we conclude that the trial court did not abuse its discretion
in denying Gibney prejudgment interest. See Tex. Fin. Code Ann. §§ 304.101, 304.104
(Vernon 2006); Johnson & Higgins of Tex., 962 S.W.2d at 530 (prejudgment interest does
not apply to claims involving purely economic loss); see also Lege v. Jones, 919 S.W.2d
870, 875-76 (Tex. App.-Houston [14th Dist.] 1996, no writ) (holding that the award of
prejudgment interest is discretionary with the trial court). Accordingly, we overrule Gibney's
third issue. 

V. Conclusion

 Based on the foregoing, we affirm the judgment of the trial court as to Gibney's
derivative claims and we reverse and render a take-nothing judgment as to Gibney's
shareholder oppression claims in favor of Roy Culver, Jr. 


 __________________________ 

 DORI CONTRERAS GARZA,

 Justice


Memorandum Opinion delivered and 

filed this the 24th day of April, 2008.




 
1. Gibney erroneously concludes that the trial court dismissed his derivative claims against Ana-Tech,
Inc. ("Ana-Tech") based on statute of limitations grounds. The record reflects that the trial judge dismissed
his claims against Ana-Tech based on his failure to provide evidence of damages.
2. Article 5.14(L) of the Texas Business Corporations Act provides that a "closely held corporation" is
a corporation with less than thirty-five shareholders and that has no shares listed on a national securities
exchange or regularly quoted in an over-the-counter market by members of a national securities association. 
Tex. Bus. Corp. Act Ann. art. 5.14(L)(2) (Vernon 2003). 
3. Gibney asserts that he was involved in the technical aspects of the company and that he spent most
of his time on the road "visiting and servicing the blending systems." Gibney also notes that he "knew little
or nothing about the day to day operations of the business" and that Roy isolated him by "refusing to furnish
or disclose information to him about the finances of Micro-Blend, Inc. despite various demands."
4. Roy does not dispute Gibney's service as Vice-President of Micro-Blend. However, Roy simply
notes that "[h]e [Gibney] was a Vice President of the company for several years . . . ." On appeal, Roy
contends that Gibney voluntarily resigned his position on the board of directors "after becoming dissatisfied
with Culver's [Roy's] management and decisions by the Board of Directors" and that Gibney "never again put
himself into consideration for membership on the Board."
5. The record reflects that Kemp Industries produced ten to twelve systems for Micro-Blend during the
relevant time frame.
6. Appellees assert that the contract price between Culver Interests and Micro-Blend was "cost plus
up to a 12% markup--the same that had been charged by Kemp Industries." On the other hand, Gibney
makes the following contentions:


 Appellee-Culver [Roy] also, owned two (2) companies, viz, Culver Interests and Ana-Tech,
Inc. Culver Interests was originally formed in 93-94 by appellee-Culver, and owned jointly
with his wife. The joint ownership ended upon divorce and resulted in sole ownership by
appellee-Culver in 1994. Later, in 96-97, appellee-Culver, formed another Culver interests
with two (2) shareholders of Micro-Blend, Inc., namely Michael Lucas and J.K. Ramsey. This
Culver Interest "Number 3" was only in existence for two (2) years (1996-1997), its sole
customer was Micro-Blend, Inc., and was supposed to be manufacturing skids for Micro-Blend, Inc. However, this Culver interest "Number 2" with no equipment, with an address on
the secretary, Terri Doyel's Desk, took $2.75 million dollars from Micro-Blend, Inc., under the
disguise that it was building skids for Micro-Blend, Inc. 


(Record citations omitted).
7. In his brief on cross-appeal, Roy notes that "Culver Interests was the assumed name of three
separate Culver-related entities." The first entity was a sole proprietorship. The second entity was a
partnership between Roy and his ex-wife that ended upon their divorce. The third entity was a partnership
between Roy and two other Micro-Blend shareholders. It is the third entity which dissolved and distributed
its assets to Micro-Blend in 1997.
8. Roy asserts that the equipment given to Micro-Blend by Culver Interests "was worth $75,000-$80,000 . . . ." 
9. Appellees note that the $28,000 a year savings that Ana-Tech afforded Micro-Blend represented
a savings of $140,000 over five years, the minimum amount of time it would take for Micro-Blend's experience
rating to match Ana-Tech's. Roy further notes that Micro-Blend would not have been able to procure the
$45,000 to $50,000 liability premiums that Ana-Tech procured because of Micro-Blend's start-up company
status. In addition, Roy contends that voluminous payroll records were introduced at trial which established
that "persons working for Micro-Blend's benefit--who were formally Ana-Tech employees--were also paid
by Micro-Blend" and that the contracts between Ana-Tech and Micro-Blend were legitimate business
arrangements that constituted a reasonable business decision by Micro-Blend's board of directors.
10. The record reflects that Gibney joined Ana-Tech in his shareholder derivative action on April 15,
2003, in his second of seven amended petitions. In his fourth amended petition, the relevant petition for the
first trial on the merits, Gibney sought $40,000,000 in relief, including attorney's fees and exemplary damages, 
for claims of breach of the duty of care by Roy, the usurpation of corporate opportunities, self-dealing by Roy
to defraud Micro-Blend, gross negligence, mismanagement and misappropriation of corporate assets, breach
of the duty of loyalty to Micro-Blend and its shareholders by Roy, and that Culver Interests and Ana-Tech were
"sham organizations" used and created by Roy to usurp Micro-Blend's business opportunities and to siphon
income from Micro-Blend.
11. The retrial and the resulting judgment is the subject of Gibney's appeal and appellees' cross-appeal. 
12. In his seventh amended petition, Gibney asserted that (1) Roy used Ana-Tech to siphon over $4.93
million from Micro-Blend from 1994-2000 under the disguise of "payroll services," (2) Roy, through Culver
Interests, received over $2.75 million from Micro-Blend for skids that were actually manufactured by Micro-Blend, (3) Roy breached the duty of care in the management of Micro-Blend and breached the duty of loyalty
to Micro-Blend and its shareholders, (4) Roy failed and refused to allow Gibney and other shareholders an
opportunity to inspect the books and financial records of Micro-Blend despite various requests, (5) Roy
mismanaged and misrepresented the affairs of Micro-Blend by failing to disclose the financial status and
account for all of Micro-Blend's income and expenses, (6) Roy misappropriated both the corporate assets and
opportunities of Micro-Blend, (7) Roy engaged in oppressive conduct towards minority shareholders, which
involved the suppression of dividends, changing the corporation form from an "S" corporation to a "C"
corporation, and the siphoning off of corporate earnings through excessive compensation to himself and his
family, (8) Roy engaged in offensive and outrageous conduct towards Gibney which caused Gibney to suffer
mental anguish, emotional distress, and to live in constant fear of his life, (9) Roy's actions were intentional
and grossly negligent with respect to the rights of appellant, (10) Roy formed Culver Interests, along with J.K.
Ramsey and "Lawrence Lucas," to defraud Micro-Blend of at least $2.75 million, and (11) Roy engaged,
authorized, or ratified the "consistent destruction of documents by and through Terri Doyel . . . to hide and
secrete his unlawful acts." Gibney continued to allege that he and the other minority shareholders suffered
damages in the maximum sum of $40,000,000.
13. Paragraph thirteen of Gibney's seventh amended petition provides:


 13. Micro-Blend,Inc. was in the business of building skids. On or about 1994, Roy Culver,
Jr., formed Culver [I]nterests and misrepresented that it was building skids for Micro-Blend,
Inc. However, the skids were being built by Micro-Blend, Inc. From 1994 through 1997, Roy
Culver, Jr., through Culver Interests, received over $2.75 million from Micro-Blend, Inc. for
skids that were actually built by Micro-Blend, Inc. Plaintiffs will further show that Culver
Interests is a sham organization, and that Roy Culver, Jr. used his position as the Chief
Executive Officer and Majority Shareholder to perpetuate such a fraud on Micro-Blend, Inc.
14. The trial court's February 2, 2006 judgment awarded Gibney post-judgment interest at the rate of
7% per annum and costs of court. The trial court also concluded that appellees should take nothing from their
counterclaim. Moreover, the trial court explicitly denied Gibney prejudgment interest in this order.
15. Roy notes on appeal that "[b]ecause of the order in which the notices of appeal were docketed,
Gibney is appellant and Roy and the entity defendants are appellees. This later cross-appeal properly reflects
only Roy as the cross-appellant and Gibney as cross-appellee."
16. Gibney also directed this Court to Plaintiff's Exhibit 32, which is a voluminous exhibit that contains
the bylaws of Micro-Blend and numerous copies of Roy's bank statements from the First National Bank of
Ingleside. The bank statements are organized chronologically from August 1996 to March 2002, but Gibney
failed to explain what this Court is to glean from this compilation of paperwork. See Tex. R. App. P. 38.1(h).
17. Gibney testified at trial that when he left Micro-Blend, at sometime in 1995, he knew "there was
something wrong" because "[o]ur sales had skyrocketed and when I left, I knew we should be getting a
dividend. I mean, big dividends." In regard to Gibney's personal knowledge of what was wrong, Gibney
testified that he had suspicions that something was wrong and that Mike Lucas had told him something, but
that it didn't make sense to him. Gibney further noted "[i]t shocked me to think that I am making $50,000 and
there's a secretary making [$]80,000 or 70 or whatever, 75 or 78."
18. The record reflects that appellees moved for an instructed verdict on limitations grounds as to
paragraphs thirteen and fourteen [claims against Ana-Tech] of Gibney's seventh amended petition. However,
the trial court specifically noted that: "Therefore, I'm going to find that under paragraph 13 of your petition,
this contract of Micro-Blend is barred by the statute of limitations." The trial court did not find that paragraph
fourteen of Gibney's seventh amended petition was barred by the statute of limitations.
19. Gibney, in his case-in-chief, presented voluminous payroll records, invoices, checks, receipts, and
bills of lading. Included in these voluminous records were copies of what we have previously referred to as
Defendant's Exhibits 45, 72, and 74, which, as we have previously concluded, conclusively established that
Gibney did not establish a right to judgment on statute of limitations grounds. See Kelly v. Diocese of Corpus
Christi, 832 S.W.2d 88, 90-91 (Tex. App.-Corpus Christi 1992, writ dism'd w.o.j.).
20. Specifically, Roy notes that: "(1) Gibney's expression of personal opinion that the salaries and
compensation were 'shocking' is incompetent evidence; (2) evidence of the amount of the salaries and
compensation alone does not provide evidence of excessiveness; (3) 'excessive compensation' claims require
expert testimony to rebut the presumptive reasonableness of the salaries and compensation received; and
(4) to the extent profit from transactions between Micro-Blend and other Culver entities could be construed
as compensation, the evidence either conclusively established that the transactions occurred before
November 27, 1998 or did not show any profit to the other Culver entity." Roy further notes that "[m]ere
minority shareholder dissatisfaction with corporate governance is not enough to support a finding of
shareholder oppression. Evidence of conduct prejudicial to the minority shareholder, so harsh and
burdensome as to visibly depart from ordinary standards of fair dealing, is required. There is no such
evidence in this record." 
21. Gibney makes the following allegations with respect to his excessive compensation claims against
Roy's family members:


 (1) Brother--Doug Culver, with little or no education, no license, no certification, no office,
and was making over $72,000.00, in compensation per year, plus, benefits; (2) Disabled
Son--Troy Culver, with a [b]rain injury and receiving Social Security Benefits, with little or no
education, no license, no certification, and only sweeps and cleans-up the shop was making
over $72,000.00, in compensation per year, plus, benefits; (3) Daughter Dawon [sic]
Spiegelhoff with little or no education, no license, no certification, and who [sic] job was to
answer the telephone, was making over $46,000.00 in compensation per year, plus benefits.

 (4) Family Member/Friend--Terry Doyel, the secretary with three (3) Hats, with little or no
education, no license, no certification . . . was making over $80,000.00 in compensation per
year, plus benefits. Cross-appellant, Culver, Jr., has little education, no license, no
certification, and does not know how to build a skid, was double dipping, by making double
compensation from Micro-Blend, Inc., of over $186,000.00 per year, plus, benefits. (Record
citations omitted) (emphasis in original).
22. The record, however, contains an email from Gibney to Helm Pletcher Bowen & Saunders L.L.P.
dated November 18, 1997, where Gibney admits that he made $100,000 from Micro-Blend in the year 1996. 
Roy notes that Micro-Blend distributed almost $420,000 in dividends to Gibney between 1995 and 2004. 
Gibney testified that he remained a contract employee with Micro-Blend, earning only $1,000 per week,
because he "was expecting big paybacks from the dividends." In addition, the record reflects that Gibney
voluntarily resigned from the Micro-Blend Board and from his position as a contract employee with Micro-Blend. 
23. Article 12.31 of the Texas Business Corporation Act provides that "[a] close corporation shall be
managed . . . (1) by a board of directors in the same manner an ordinary corporation is managed by its board
of directors under this Act; or (2) in the manner provided for in its articles of incorporation or in a shareholders'
agreement." Tex. Bus. Corp. Act Ann. art. 12.31 (Vernon 2003). The Texas Business Corporation Act also
addresses the duties of directors in close corporations. See id. art. 13.06 (Vernon 2003). Specifically, "[i]n
discharging the duties of director under this Act or otherwise, a director, in considering the best interests of
the corporation, may consider the long-term as well as the short-term interests of the corporation and its
shareholders, including the possibility that those interests may be best served by the continued independence
of the corporation." Id.
24. Roy recalled that on one occasion the Board authorized a bonus of $45,000, but he could not recall
when the Board authorized the bonus.
25. As previously noted, Roy's tax returns indicate that he received $186,598.36 in wages, tips, and
other compensation during 2000 and $1,093,447.02 in 2001. The record does not contain information as to
the extra income Roy received in 2001. However, it is clear from the record that Roy has created and run
several successful businesses and it is plausible that the additional income is derived from another such
business. 
26. Doug's tax returns reflect that he received $31,000 in wages, tips, and other compensation during
2000 and $67,140.99 in 2001.
27. Doyel's tax returns reflect that she received $50,408.96 in wages, tips, and other compensation in
2000 and $68,412.40 in 2001.
28. Speigelhoff's tax returns reflect that she received $38,613.60 in wages, tips, and other
compensation in 2000 and $45,989.96 in 2001.
29. Troy's tax returns indicate that he received $68,511.42 in wages, tips, and other compensation in
2000 and $77,558.52 in 2001.
30. We address this issue in full because "a claim of oppressive conduct can be independently
supported by evidence of a variety of conduct." Redmon v. Griffith, 202 S.W.3d 225, 234 (Tex. App.-Tyler
2006, pet. denied) (citing Davis, 754 S.W.2d at 381). "Because any one of a variety of activities or conduct
can give rise to shareholder oppression, the fact that there may be a lack of evidence to support the existence
of one such activity does not defeat the claim so long as there is evidence to support that another such
instance of conduct occurred." Id. at 234 n.3. 
31. We have already determined that the jury questions pertaining to excessive compensation upon
which Gibney relies were not supported by the evidence; however, in light of the Redmon case, we will
examine the entire record for other potential instances of oppressive conduct on the part of Roy towards
Gibney. See Redmon, 202 S.W.3d at 234 & n.3.
32. In support of this contention, Gibney cites several cases from different jurisdictions. See Cont'l
Coffee Prods. Co. v. Cazarez, 937 S.W.2d 444, 452 (Tex. 1996); Davis v. Sheerin, 754 S.W.2d 375, 381 (Tex.
App.-Houston [1st Dist.] 1988, writ denied); Balvik v. Sylvester, 311 N.W.2d 383, 389 (N.D. 1987); Baker v.
Commercial Body Builders, Inc., 507 P.2d 387, 393-94 (Or. 1973) ("Or the plundering of a "close" corporation
by the siphoning off of profits by excessive salaries or bonus payments and the operation of the business for
the sole benefit of the majority of the stockholders, to the detriment of the minority stockholders, would
constitute such "oppressive" conduct as to authorize a dissolution of the corporation under the terms of ORS
57.595 [Or. Rev. Stat. Ann. § 57.595 (West 2005)]."); Browning v. C & C Plywood Corp., 434 P.2d 339, 340-43 (Or. 1967).

 
33. Article VI of the Micro-Blend bylaws provides the following:


 1. Declaration

 

 The board of directors may declare at any annual, regular or special meeting of the board
and the corporation may pay, dividends on the outstanding shares in cash, property or in
share of the corporation to the extent permitted by, and subject to the provisions of, the laws
of the State of Texas.

 

 2. Reserves

 

 Before payment of any dividend there may be set aside out of any funds of the corporation
availabe [sic] for dividends such sum or sums as the directors from time to time in their
absolute discretion think proper as a reserve fund to meet contingencies or for equalizing
dividends or for repairing or maintaining any property of the corporation or for such other
purpose as the directors shall think conducive to the interest of the corporation, and the
directors may abolish any such reserve in the manner in which it was created.